KALIAN AT POCONOS,
LLC., Plaintiff

v.

SAW CREEK ESTATES COMMUNITY
ASSOCIATION, INC., Rose Giovinco,
Jene Farrell, Nathan Lubow, John
Sivick, Richard Krauthamer, Henry
Ramirez, Richard Sanderman, Louis
Scaltrito, and Nicholas J. Mazzarella,
Defendants

No. 3:CV–02–1901.

United States District Court,
M.D. Pennsylvania.

Aug. 5, 2003.

H. Peter Nelson, Jeffrey G. Trauger, Grim, Biehn & Thatcher, Perkasie, PA, for Plaintiff.

Janet Marsh Catina, Office of the District Attorney, Stroudsburg, PA, Zygmunt R. Bialkowski, Jr., Margolis Edelstein, Scranton, PA, for Defendants.

## *MEMORANDUM*

VANASKIE, Chief Judge.

On October 23, 2002, plaintiff Kalian at Poconos, L.L.C. ("Kalian") commenced this action, alleging that defendants Saw Creek Estates Community Association, Inc. ("the Association"), Rose Giovinco, Jene Farrel, Nathan Lubow, John Sivick, Richard Krauthamer, Henry Ramirez, Louis Scaltrito, Nicolase J. Mazzarella (collectively, "the defendants"), and Richard Sanderman infringed upon its rights as a declarant and developer of Saw Creek Estates by requiring Kalian to pay certain fees and assessments. Kalian also alleges a civil rights violation under 42 U.S.C. § 1983; a violation of the civil racketeering statute, 18 U.S.C. § 1962; and state tort claims for interference with contractual relations, interference with prospective contractual relations, and slander of title/commercial disparagement. The defendants have filed a motion to dismiss, (Dkt. Entry 19), and Kalian has filed a motion for partial judgment on the pleadings.[1]

Because Kalian cannot show that the defendants' disputed actions were conducted under color of state law, the defendants' motion to dismiss will be granted as to Count XI, the civil rights claim. Count XII, the civil racketeering claim, will also be dismissed because Kalian has not alleged that the defendants committed two or more predicate acts amounting to racketeering. Count X, the slander of title/commercial disparagement claim, will

---

1. For the reasons stated *infra,* Kalian's motion for judgment on the pleadings will be construed as a motion for summary judgment.

be dismissed because Kalian fails to adequately allege publication of the alleged slanderous statements to a third party. The motion to dismiss will be denied, however as to all other counts, because diversity jurisdiction exists in this case, and because the allegations underlying the counts for declaratory judgment and tortious interference with contract are adequate to state claims for which relief may be granted. Kalian's motion, in which it seeks a declaratory judgment that it possesses declarant and developer rights and that the Association may not impose certain fees and assessments, will be granted.

## BACKGROUND

This litigation concerns Saw Creek Estates, a large planned community of single-family homes and townhomes located in Lehman Township, Pike County, Pennsylvania, and Middle Smithfield Township, Monroe County, Pennsylvania (hereinafter, "the Community"). In 1975, Lehman–Pike Development Corp. ("Lehman–Pike") began constructing the Community. In doing so, Lehman–Pike recorded certain covenants and restrictions, and amendments thereto, applicable to each of the lots in the Community, and established the Association to manage the day-to-day operation of the Community.

In the late 1990s, a lawsuit was filed against Lehman–Pike by certain property owners within the Community. On September 15, 1999, Lehman–Pike and the Association entered into a Settlement Agreement to resolve this lawsuit. As part of the agreement, Lehman–Pike transferred certain rights and facilities to the Association. Pertinent to this litigation, paragraph twelve of the agreement stated:

 a. Lehman Pike, its successors and assigns, shall retain the rights stated in Exhibit 2 for the Development. It shall exercise those rights for the exclusive purposes directly related to the sale of its existing unsold Lot inventory and for no other purpose.... The Property Owners Association and the Community Association agree to take no other action to interfere with or disrupt any of the activities permitted by Exhibit 2, and to act in a manner contemplated by and expressed in the Community's legal documents and state law.

 b. Lehman Pike shall not be required to pay any dues or assessments on any unimproved Lots owned by it which are held for sale to the public, and shall have no votes in the Community Association for these Lots[.] Lehman Pike shall be required to pay dues and assessments on all improved Lots it owns....

(Ex. 1, Dkt. Entry 29, Settlement Agreement, at 23.) Exhibit 2 of the Settlement Agreement contains an "Assignment of Declarant Rights"[2] from Lehman–Pike to

**2.** "Declarant Rights" are defined by the Settlement Agreement as "any and all rights held by Lehman Pike under the Covenants, or otherwise, as the declarant with respect to the Covenants and as the developer of the Development." (Ex. 2, Dkt. Entry 29, ¶ 2(i).) Pennsylvania's Uniform Planned Community Act ("UPCA"), 68 Pa. Cons.Stat. Ann. §§ 5101–5414, defines a "Declarant" as:

 (1) If a planned community has been created, the term means any of the following:
 (i) Any person who has executed a declaration or an amendment to a declaration to add additional real estate....

 (ii) A person who succeeds under section 5304 (relating to transfer of special declarant rights) to any special declarant rights....

68 Pa. Cons.Stat. Ann. § 5103. Generally, a declarant will have "developer rights," which are defined as:

 Any right or combination of rights reserved by a declarant in the declaration:
 (1) to add real estate to a planned community;
 (2) to create units, common facilities, limited common facilities, controlled facilities or

the Association dated April 10, 2000. In relevant part, it states that:

> As a fundamental part of the general plan of development for the Saw Creek Estates, Lehman–Pike hereby assigns to [the Association], its successors and assigns, the rights of Lehman–Pike so designated in the Exhibit to this Agreement.... Lehman–Pike, its successors and assigns, shall also retain the status as a Declarant for the sale of its remaining lot inventory, and as to the rights retained by it under this Assignment.[3]

(Ex. 2, Dkt. Entry 29.) Finally, the Settlement Agreement concluded with a paragraph that stated that "[t]his Agreement shall bind and inure to the benefit of the parties and their respective heirs, successors and assigns." (Ex. 1, Dkt. Entry 29, ¶ 19.)

On June 1, 2000, Lehman–Pike conveyed 178 unimproved building lots in the Community to Silver Ridge, L.L.C. ("Silver Ridge") and 36 unimproved building lots to Philip Rizzo. On the same day, Lehman–Pike, Rizzo, and Silver Ridge entered into an agreement whereby certain declarant and developer rights held by Lehman–Pike were to be assigned to Rizzo and Silver Ridge. (*See* Ex. 3, Dkt. Entry 29, Assignment of Developer Rights and Interests.) That agreement provided that "[a]s required by the Purchase Agreement, Lehman–Pike desires to assign and Purchaser desires to accept an assignment of certain of the declarant and developer rights retained by Lehman–Pike, which rights shall be exercised jointly by the parties to this assignment." (*Id.*, ¶ 6.) The "certain" rights assigned by Lehman–Pike included

> limited controlled facilities within a planned community;
> (3) to subdivide units to convert units into common facilities or controlled facilities; or
> (4) to withdraw real estate from a planned community.
>
> *Id.*

"[t]he rights, duties and interests ... set forth in Paragraph 12, Subsections (a) and (b), of the Settlement Agreement." (*Id.*, ¶ 1.) In addition, the June 1, 2000 Assignment of Developer Rights and Interests provided that declarant rights were assigned to Kalian as follows:

> (a) in that portion of the last sentence of Paragraph 1 of the Assignment of Declarant Rights which provides that Lehman–Pike, its successors and assigns, "shall also retain the status as a Declarant for the sale of its remaining lot inventory," and
>
> (b) the rights granted pursuant to declaration No. 7 of the Declarations of Covenants and Restrictions for Saw Creek Estates, which provides the right of ingress, egress and regress within Saw Creek Estates, which rights were retained by Lehman–Pike in the Assignment of Declarant Rights.

(*Id.*, ¶ 2.)

Kalian argues that this agreement constituted a valid assignment of Lehman–Pike's declarant rights to Rizzo/Silver Ridge. The defendants, on the other hand, contend that the assignment of declarant rights to Rizzo/Silver Ridge was not effective until the Association ratified the assignment in an agreement between the Association and Lehman–Pike dated September 21, 2000. (Def. Mem. in Opp., Dkt. Entry 40, Ex. A.) This agreement stated:

> 1. DUES ON RIZZO LOTS. The Association hereby agrees and acknowledges that the June 1, 2000 Assignment of Developer Rights and Interests between Lehman–Pike and

---

**3.** Lehman–Pike retained for itself several rights related to utilities, including, *inter alia,* the right to easements for installation and maintenance of utilities, the right of ingress and egress, and the right to determine the entity to own and operate the central water system. (*See* Ex. 2, Dkt. Entry 29, Assignment of Declarant Rights.)

Rizzo constituted a valid and effective assignment and retention by Lehman–Pike to Rizzo of the "Declarant Rights" of Lehman–Pike, as such term is defined in the Assignment and in settlement agreement dated effective September 15, 1999, of which Lehman–Pike and the Association are parties. Consequently, the Rizzo Lots[4] shall not be subject to annual dues or any special assessments adopted by the Board of Directors or membership until such time that the Rizzo Lots are transferred or leased to third parties, whichever occurs first. The Rizzo Lots, however, are otherwise subject to the covenants and restrictions of record, the rules and regulations and the By–Laws of the Association, and applicable laws.

\* \* \* \* \* \*

10. ASSIGNMENT. This Agreement shall not be assigned in whole or in part or transferred by either party hereto in any manner whatsoever without the prior written consent of the other party being first had and obtained. Subject to the prohibitions and limitations on assignment herein set forth, this Agreement shall extend to and bind the heirs, executors, administrators, successors and assigns of the parties hereto.

(*Id.*, ¶¶ 1, 10.)

On April 15, 2002, Kalian purchased 109 unimproved building lots from Rizzo and Silver Ridge and agreed to acquire title to their remaining unimproved building lots on or before April 1, 2003. Additionally, Kalian acquired certain rights in and to mortgages on other unimproved building lots located in the Community. These mortgages were previously acquired by Silver Ridge from Lehman–Pike. Simultaneously with these acquisitions, Rizzo and Silver Ridge executed an assignment of certain declarant and developer rights to Kalian. (*See* Ex. 4, Assignment of Declarant and Developer Rights and Interests, Dkt. Entry 29.) Rizzo and Silver Ridge purported to assign to Kalian "all of the declarant rights, obligations and interests assigned to Seller by Lehman–Pike for the lots being purchased by [Kalian] … includ[ing] those set forth in Paragraph 12 of the Settlement Agreement …." (*Id.*, ¶ 1.)

Trouble began shortly after Kalian's purchase of the building lots. Subsequent to Kalian's purchase, the Association allegedly established a $1,000 per lot application and appraisal fee on all new construction, raised the minimum required habitable floor space area for any new dwelling to 1,600 square feet from 1,000 square feet, and raised the amount necessary to obtain a compliance bond from $1,500 per lot to $50,000 per builder. On August 15, 2002, the Association sent an invoice to Kalian demanding that Kalian pay $101,034, which included Association dues of $57,834, a capital improvement fee of $37,800, and a resale certificate fee of $5,400. (Ex. F, Complaint, Dkt. Entry 1.) These charges were calculated on the basis of the number of unimproved lots acquired by Kalian from Rizzo/Silver Ridge.

On October 23, 2002, Kalian filed the complaint in the present matter. Counts I through VII of the complaint seek a declaratory judgment regarding Kalian's status as a declarant and the Association's authority to impose fees, assessments, and compliance bonds upon Kalian.[5] Count

---

4. The term "Rizzo Lots" included the lots transferred to Silver Ridge. (Def. Mem. in Opp., Dkt. Entry 40, Ex. A, ¶ C.)

5. Specifically, Count I seeks a declaratory judgment that Kalian was assigned declarant rights from Rizzo/Silver Ridge. Count II seeks a declaratory judgment that Kalian is

VIII alleges intentional interference with contractual relations, while Count IX alleges the same tort with regard to prospective contractual relations. Count X alleges slander of title/commercial disparagement. The last two counts involve federal claims: Count XI alleges a civil rights violation under 42 U.S.C. § 1983; Count XII alleges a civil RICO violation under 18 U.S.C. § 1962. (Complaint, Dkt. Entry 1.)

Shortly after initiating this action, Kalian sought a preliminary injunction against the Association so that it could begin construction and sales of its unimproved building lots. This motion was resolved by a Stipulation and Order on December 30, 2002.[6] (Dkt. Entry 10.)

The defendants filed the pending motion to dismiss on February 25, 2003, (Dkt. Entry 19), asserting that this Court lacks diversity jurisdiction over this matter and that Kalian's complaint failed to state a claim upon which relief can be granted.[7] Kalian filed its motion, deemed a "motion for partial judgment on the pleadings," but, as explained below, actually a summary judgment motion, on March 14, 2003. (Dkt. Entry 29.) Oral argument on these motions was conducted on May 30, 2003.

## THE MOTION TO DISMISS

### A. Standard of Review

"When a motion under Rule 12 is based on more than one ground, the court should consider the 12(b)(1) challenge first because if it must dismiss the complaint for lack of subject matter jurisdiction, all other defenses and objections become moot." *In re Corestates Trust Fee Litig.*, 837 F.Supp. 104, 105 (E.D.Pa.1993)(Buckwalter, J.), *aff'd*, 39 F.3d 61 (3d Cir.1994). When subject matter jurisdiction is challenged under Rule 12(b)(1), the plaintiff bears the burden of persuasion. *NMC Homecare, Inc. v. Shalala*, 970 F.Supp. 377, 382 (M.D.Pa.1997). In reviewing such a motion, the court can consider not only the pleadings, but any additional evidence made available to the court. *Robinson v.*

not obligated to pay the Association's fees and assessments because of its declarant and developer rights. The rest of the claims focus on specific fees and assessments: Count III on the effects upon Association liens when Kalian forecloses on mortgages it obtained from Rizzo/Silver Ridge; Count IV on the Association's requirement that Kalian purchase resale certificates for each of the lots; Count V on the Association's capital improvement fees; Count VI on the Association's application and appraisal fees and the compliance bond; and Count VII on the change of the minimum habitable floor space requirement from 1,000 square feet to 1,600 square feet.

6. The Association's first bond resolution of September 4, 2002, had required a compliance bond equal to the cost of the improvements to be constructed on the lot. On December 21, 2002, following the filing of a preliminary injunction motion by Kalian, the Association passed a new resolution requiring any entity wishing to construct improvements to post a blanket $50,000 bond to be renewed annually. Kalian was able to post this new compliance bond and paid certain Association fees and assessments into an escrow account. (*See* Stipulation and Order, Dkt. Entry 10.)

7. Defendant Sanderman, who is proceeding *pro se*, has also filed a motion to dismiss. (Dkt. Entry 30.) In his motion, Sanderman accuses Kalian of pursuing this action with the intent to "denude the property, build substandard houses, [and] prevent all opposition ...." (*Id.* at 2.) Although the Court sympathizes with Sanderman's frustration at finding himself in federal court for a second time, the motion to dismiss does not allege that Kalian has failed to state a claim upon which relief can be granted. Rather, Sanderman compares this action with a previous lawsuit involving a Lanham Act violation. The two cases do not involve similar issues, and the fact that Sanderman is once again involved in litigation cannot, by itself, provide a basis for dismissing him from the action. Therefore, Sanderman's motion to dismiss will be denied.

Sanderman recently filed a second motion to dismiss. (Dkt. Entry 46.) That motion is not yet ripe for review.

*Dalton,* 107 F.3d 1018, 1021 (3d Cir.1997). Unlike a Rule 12(b)(6) motion, under a 12(b)(1) motion to dismiss, " 'no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of the jurisdictional claim.' " *Robinson,* 107 F.3d at 1021 (citing *Mortensen v. First Fed. Savings & Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977)). A complaint may be dismissed for lack of subject matter jurisdiction on a 12(b)(1) motion only if it appears to a certainty that a colorable claim cannot be asserted. *Smith v. Soc. Sec. Admin.,* 54 F.Supp.2d 451, 453 (E.D.Pa.1999). Trial judges, however, "enjoy substantial procedural flexibility in handling Rule 12(b)(1) motions." *Berardi v. Swanson Mem. Lodge No. 48,* 920 F.2d 198, 200 (3d Cir.1990)(citing *Land v. Dollar,* 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947)).

In deciding a motion to dismiss filed pursuant to Rule 12(b)(6), the Court may dismiss a claim where "the plaintiff can prove no set of facts in support of the claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In deciding a motion to dismiss filed pursuant to Rule 12(b)(6), the Court must draw all reasonable inferences from the facts pled in the complaint and construe them in the light most favorable to the claimant. *Unger v. Nat'l Residents Matching Program,* 928 F.2d 1392, 1400 (3d Cir.1991); *Truhe v. Rupell,* 641 F.Supp. 57 (M.D.Pa.1985). The Court, however, "need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss," *Morse v. Lower Merion School District,* 132 F.3d 902, 906 (3d Cir.1997)(quoting *In re Burlington Coat Factory Securities Litigation,* 114 F.3d 1410, 1429–30 (3d Cir.1997)), and should reject "unwarranted inferences" and "unsupported conclusions." *Id.* at 906 n. 8

(citing 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (2d ed.1997)). Thus, a Rule 12(b)(6) motion does not serve to question a plaintiff's well-pled facts, but rather tests the legal foundation of the plaintiff's claims. *United States v. Marisol, Inc.,* 725 F.Supp. 833, 836 (M.D.Pa.1989).

The Rule 12(b)(6) movant carries the burden of showing the legal insufficiency of the claims asserted. *Johnsrud v. Carter,* 620 F.2d 29, 33 (3d Cir.1980). A Rule 12(b)(6) motion will be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley,* 355 U.S. at 45–46, 78 S.Ct. 99; *see Brown v. Philip Morris, Inc.,* 250 F.3d 789, 796 (3d Cir.2001)("[w]e may dismiss the complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations").

## B. Diversity Jurisdiction Exists

Federal courts have original subject matter jurisdiction over actions in which the matter in controversy exceeds $75,000 and the parties are citizens of different states. 28 U.S.C. § 1332. Section 1332 requires complete diversity of citizenship, i.e., the citizenship of all the defendants must be diverse from the citizenship of all the plaintiffs. *See generally Owen Equip. & Erection Co. v. Kroger,* 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978). Defendants argue that complete diversity does not exist in this case because Kalian is registered with the Pennsylvania Department of State as a foreign limited liability company with its principal place of business at Sixth and Chestnut Streets, Perkasie, Pa. (Def. Mem. in Support of Mot. to Dismiss, Dkt. Entry 25, at 8.) According to the Defendants, Kalian is a Bucks County company, while its parent company—Kalian Companies—is a New Jersey corporation.

■ Kalian, however, is a limited liability company. A limited liability company is an unincorporated association that is treated as a limited partnership for purposes of diversity jurisdiction. *See Pippett v. Waterford Dev., LLC,* 166 F.Supp.2d 233, 236 (E.D.Pa.2001); *see also Kirkland v. SSL Americas, Inc.,* 263 F.Supp.2d 1326, 1333 (M.D.Ala.2003)(citing cases). The citizenship of a limited partnership "is deemed to be that of the persons composing such association." *Pippett,* 166 F.Supp.2d at 236 (quoting *Trent Realty Assocs. v. First Fed. Savings & Loan Ass'n,* 657 F.2d 29, 31–32 (3d Cir.1981)); *see also Carden v. Arkoma Assocs.,* 494 U.S. 185, 187–92, 110 S.Ct. 1015, 108 L.Ed.2d 157 (1990)(holding that only corporations, and not other business entities such as limited partnerships, are considered citizens of the state which created it).

■ Mazin A. Kalian, the managing member of Kalian, has signed an affidavit stating that Kalian had only two partners at the commencement of this action, Mazin Kalian and Mark S. Bellin, both of whom reside in New Jersey. (*See* Dkt. Entry 45.) Kalian's citizenship is deemed to be that of Bellin and Mazin Kalian—New Jersey. None of the defendants are citizens of New Jersey. Thus, complete diversity exists in this matter and the motion to dismiss under Rule 12(b)(1) will be denied.[8]

## C. The RICO Claim

■ At oral argument, I ruled that Kalian's civil racketeering claim is not viable. A plaintiff pursuing a claim under the Racketeer Influenced and Corrupt Organizations statute, 18 U.S.C. §§ 1961–1968, must show that the defendant "participated through a pattern of racketeering activity that must include the allegation of at least two racketeering acts." *Bailey v. Reed,* 29 Fed.Appx. 874, 875, 2002 WL 276470, at *1 (3d Cir.2002). As noted at oral argument, the defendants have not committed any "racketeering" activities. Kalian alleges that the Board of Directors and Defendant Mazzarella violated 18 U.S.C. § 872, but that statute applies only to extortion committed by officers and employees of the United States. Similarly, Kalian accuses the defendants of violating 18 U.S.C. § 874, which deals with kickbacks by government contractors and is applicable only to individuals involved in the construction, prosecution, completion, or repair of public buildings. Nor is 18 U.S.C. § 1951, interference with commerce by threats or violence, at issue here, since violation of this statute requires the unlawful taking (or attempt to unlawfully take) property by wrongful use of actual or threatened force, violence, or fear.[9] Finally, mere use of the mail to send the invoice requesting payment of the disputed fees was not mail fraud.[10]

8. Because this Court has subject-matter jurisdiction based on diversity of citizenship, it is unnecessary to consider the defendants' arguments that this Court should decline to exercise supplemental jurisdiction over Kalian's state law claims.

9. Similarly, 18 Pa. Cons.Stat. Ann. § 3923 (1983)("Theft by Extortion"), was not violated by the defendants.

10. Mail fraud consists of two elements: "(1) having devised or intending to devise a scheme to defraud (or to perform specified fraudulent acts), and (2) use of the mail for the purpose of executing, or attempting to execute, the scheme (or specified fraudulent acts)." *Carter v. United States,* 530 U.S. 255, 261, 120 S.Ct. 2159, 147 L.Ed.2d 203 (2000)(citing 18 U.S.C. § 1341). Kalian has not alleged, nor can it allege, a scheme to defraud—the Association did not make any misrepresentations in the invoice, but claimed only that Kalian owed certain fees. That there is a question as to whether the Association has a right to impose the fees does not convert its attempt to do so into fraud.

As I stated at oral argument, this case centers around a dispute as to the contractual rights of the parties under the Settlement Agreement and subsequent agreements, not illicit actions. While Kalian may disagree with the Association's right to impose fees and assessments, the Association did not act criminally in attempting to impose the fees and assessments. Therefore, the motion to dismiss will be granted as to Count XII, the civil racketeering claim.

### D. The Civil Rights Claim

■ To state a claim under 42 U.S.C. § 1983, a plaintiff must allege a violation of rights secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under the color of state law.[11] *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir.1995); *Kost v. Kozakiewicz*, 1 F.3d 176, 184 (3d Cir.1993). Here, Kalian claims that it was deprived of its "fundamental property interest in the unimproved building lots located within the development" by the Association's restrictions on Kalian's ability to market, develop, and transfer the lots. (Pl. Brief in Opp. to Mot. to Dismiss, Dkt. Entry 39, at 19.) Kalian uses the "public function" test to determine that the Association acted under color of state law.

#### (a) Violation of Constitutionally–Guaranteed Rights

Kalian alleges that the Association has deprived it of its fundamental property interest in the unimproved building lots. Specifically, Kalian accuses the Association of "prohibiting and inhibiting ... Kalian's ability to market, develop, and transfer these lots." (Pl. Brief in Opp. to Mot. to Dismiss, Dkt. Entry 39, at 19.) Contrary to the defendants' assertion, this is not a "vague and inconclusory" statement. Kalian is stating that its right to use and enjoy its property is being infringed by the Association's actions.

The Fourteenth Amendment declares that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. "[W]hen complaining of a violation of substantive due process rights, a plaintiff must prove that the governmental authority 'acted to infringe [ ] a property interest encom passed by the Fourteenth Amendment.'" *DeBlasio v. Zoning Bd. of Adjustment*, 53 F.3d 592, 600 (3d Cir.1995)(quoting *Acierno v. Cloutier*, 40 F.3d 597, 616 (3d Cir.1994)). To make out a substantive due process claim, "a plaintiff must have been deprived of a *particular quality* of property interest." *Nicholas v. Penn. State Univ.*, 227 F.3d 133, 140 (3d Cir.2000)(quoting *DeBlasio v. Zoning Bd. of Adjustment*, 53 F.3d 592, 598 (3d Cir.1995)(emphasis added)). Ownership meets this requirement and "is a property interest worthy of substantive due process protection." *Indep. Enters., Inc. v. Pittsburgh Water & Sewer Auth.*, 103 F.3d 1165, 1179 (3d Cir.1997); *see also Nicholas*, 227 F.3d at 141 (stating that the scope of property interests protected by substantive due process is narrow, and that the court has "so far limited non-legislative substantive due process review to cases involving real property ownership"); *DeBlasio*, 53 F.3d at 600 ("[land] ownership is a property interest worthy of substantive due process protection"); *Holt*

11. Section 1983, 42 U.S.C. § 1983, provides: Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proceeding for redress.

*Cargo Sys., Inc. v. Del. River Port Auth.*, 20 F.Supp.2d 803, 830 (E.D.Pa.1998).

Therefore, Kalian's allegation that the Association's actions infringe on Kalian's ownership of the building lots—at least at this stage of the litigation—satisfies the § 1983 requirement that the plaintiff allege a violation of rights secured by the Constitution and laws of the United States.[12] Kalian's § 1983 claim still fails, however, because Kalian cannot show that the Association acted under color of state law when it imposed the fees and assessments upon Kalian.

### (b) Absence of State Action

■ In a § 1983 case such as this, "[s]tate action is a threshold issue . . . ." *Abbott v. Latshaw*, 164 F.3d 141, 146 (3d Cir.1998), *cert. denied*, 527 U.S. 1035, 119 S.Ct. 2393, 144 L.Ed.2d 794 (1999); *see also Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 156, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978)("Although a private [party] may cause a deprivation of . . . a right, [it] may be subjected to liability under § 1983 only when [it] does so under color of law.").

"The Supreme Court has clarified that '[i]n cases under § 1983, 'under color' of law has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment.'" *Mark*, 51 F.3d at 1141 (quoting *United States v. Price*, 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966)). Determining when there is state action "requires an inquiry into whether 'there is a sufficiently close nexus between the State and the challenged action of [the defendant] so that the action of the latter may be fairly treated as that of the State itself.'" *Id.* at 1142 (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982)).

Kalian contends that the Association should be considered a state actor under the "public function" test.[13] The Third Circuit addressed the applicability of the "public function" test in *Community Medical Center v. Emergency Medical Services of Northeastern Pennsylvania, Inc.*, 712 F.2d 878, 881–82 (3d Cir.1983) (citations omitted):

---

12. Whether Kalian could ultimately prove such a violation is questionable, because the "substantive component of the Due Process Clause is violated by executive action *only when it 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.*'" *United Artists Theatre Circuit, Inc. v. Township of Warrington*, 316 F.3d 392, 399 (3d Cir.2003)(quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 847, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998))(emphasis in original). In any event, however, Kalian has failed to allege a prima facie case under § 1983.

13. Our Court of Appeals has remarked that:

[p]erhaps because of the manifold forms of state involvement or acquiescence in private activity, the Supreme Court has thus far not attempted to develop a single standard for ascertaining the existence of state action and has stated explicitly that no such

unitary test is possible. Instead, it has adopted a number of approaches depending on the circumstances and has counseled lower courts to investigate carefully the facts of each case.

*Community Med. Ctr. v. Emer. Med. Servs. of Northeastern Pa., Inc.*, 712 F.2d 878, 880 (3d Cir.1983). There are three principle tests to determine whether there has been state action. The first test asks whether the private entity has exercised powers that are traditionally considered to be exclusive governmental powers. This test includes the "public function" inquiry. The second test asks whether the private entity acted with the help of or in concert with state officers. Finally, the courts have found state action where the government has so far insinuated itself into a position of interdependence with the acting party that it is properly considered a joint participant in the challenged activity. *See Mark*, 51 F.3d at 1142. These latter two tests are not implicated here.

Public function analysis traditionally has been applied in three different situations. First, it has been used when the government, after carrying out a particular function, [such as] the maintenance of a park, attempts to avoid its constitutional obligations by transferring the function to a private entity. Second, courts have employed the public function analysis to the exercise of those powers, such as the supervision of public elections, that are almost invariably exercised by government. Third, the public function approach has been applied in the First Amendment context to determine whether private property was functionally equivalent to a town or a business district.

Kalian relies primarily on the last situation, contending that the Association is the functional equivalent of a town.[14] (Pl. Brief in Opp. to Mot. to Dismiss, Dkt. Entry 39, at 15.)

Both parties agree that the seminal case regarding this application of the public function test is *Marsh v. Alabama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946). *Marsh* involved a suburb of Mobile, Alabama called Chickasaw that was entirely owned by a private entity, the Gulf Shipbuilding Corporation. Like other towns, Chickasaw possessed residential buildings, streets, a sewer system, and a business district. The dispute in *Marsh* revolved around the arrest of the plaintiff for attempting to distribute religious literature in the Chickasaw business district. The Supreme Court observed that had "title to Chickasaw belonged not to a private but to a municipal corporation and had appellant been arrested for violating a municipal ordinance rather than a ruling by those appointed by the corporation to manage a company-town it would have been clear that appellant's conviction must be reversed." *Id.* at 504, 66 S.Ct. 276. The Court went on to hold that the fact that the town was the property of a non-public entity was not sufficient to justify allowing the corporation to restrict the fundamental liberties of citizens. *Id.* at 509, 66 S.Ct. 276.

As counsel for the Association pointed out at oral argument, however, *Marsh* is distinguishable. In *Marsh,* the corporation assumed *all* the attributes of a state-created municipality. *See Flagg Bros.,* 436 U.S. at 159, 98 S.Ct. 1729. In contrast, the Association's authority is limited to certain declarant rights obtained through the Settlement Agreement, by the protective covenants and restrictions, and by the UPCA. Thus, the Association has the authority to

---

**14.** This case does not involve an attempt by the government to avoid its constitutional obligations by transferring a governmental function to a private entity. Nor is this a situation where the defendant is exercising powers that are almost invariably exercised by government. Kalian does intimate that the Association exercises powers that are generally reserved for the state. Specifically, Kalian notes that the Association acts as a "quasi-municipal body" and that it owns, controls, and maintains the streets, sidewalks, parks, recreation areas, and other public spaces within the community. It also charges fees for various municipal-like services, and operates under statutory authority granted to it by the UPCA. (Pl. Brief in Opp. to Mot. to Dismiss, Dkt. Entry 39, at 18.) This alone, however, is not sufficient to deem the Association a state actor. *See, e.g., Goldberg v. 400 E. Ohio Condo. Ass'n,* 12 F.Supp.2d 820, 823 (N.D.Ill.1998)(noting that condominium association did not exercise powers that were exclusive state functions, such as government elections, comprehensive ownership of town, and tax collection); *Midlake On Big Boulder Lake Condo. Ass'n v. Cappuccio,* 449 Pa.Super. 124, 673 A.2d 340, 342 (1996)(rejecting application of the public function test to condominium association because "Midlake's facilities are entirely privately run. While there is sewer service, private streets, and private maintenance, Midlake provides no facilities for community public use that are typically found in a municipality, such as schools, libraries, and other public functions.").

maintain the Community's roads and utilities, and collect dues to fund this maintenance, but can do little else. Moreover, the majority in *Marsh* found relevant the fact that "there [was] nothing to distinguish [Chickasaw] from any other town and shopping center except the fact that the title to the property belongs to a private corporation," *id.* at 503, 66 S.Ct. 276, whereas Saw Creek Estates is a gated community. This case does not involve an outsider who unwittingly ran afoul of some privately-imposed rule.

There is a more fundamental distinction, however, between *Marsh* and the present case which precludes application of the "public function" test using the *Marsh* rationale. *Marsh* and its progeny involved the exercise of First Amendment rights in public spaces. *Marsh*, of course, dealt with the exercise of the right to petition in public places, namely the business district of Chickasaw. A later case, *Amalgamated Food Employees Union v. Logan Valley Plaza*, 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968), *abrogated by Hudgens v. N.L.R.B.*, 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976), involved the picketing of one of the tenants of a shopping center by its striking employees. *See also Lloyd Corp. v. Tanner*, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972)(shopping center). Our Court of Appeals has noted this distinction. In *Community Medical Center*, the court refused to apply the "public function" test to an action involving the designation by a nonprofit corporation, which was organized to coordinate emergency health care services, of a new resource hospital, stating that the "First Amendment cases obviously are not applicable to CMC's due process and equal protection claims." *Community Med. Ctr.*, 712 F.2d at 882.

Simply put, the holdings of *Marsh* and subsequent cases are more limited than Kalian's interpretation of them. The

"public function" test is inapplicable to this case because, upon review of the facts as a whole, there is no basis for attributing Kalian's actions to the state. Thus, Kalian has failed to demonstrate that the Association acts under the color of state law, and the civil rights claim will be dismissed.

**E. The Remaining Claims**

The defendants argue that the declaratory judgment claims, counts I through VII, should be dismissed because they fail to state a claim upon which relief can be granted. The defendants state that Counts I and II (seeking declarant rights) fail because Kalian did not include a properly executed assignment of declarant rights with the complaint. As Kalian correctly points out, however, the Federal Rules of Civil Procedure require only notice pleading, and Kalian was not required to attach the assignment of declarant rights to the complaint. *See* Fed.R.Civ.P. 8(a)(stating that a complaint requires only a short and plain statement showing a right to relief); *Weston v. Pennsylvania*, 251 F.3d 420, 428–30 (3d Cir.2001)(quoting *Conley*, 355 U.S. at 47–48, 78 S.Ct. 99). Thus, failure to include a notarized assignment does not mandate dismissal of Counts I and II.

Nor is dismissal warranted for Counts III through VII. The Association's position is based upon its assertion that Kalian is not a holder of declarant or developer rights with respect to the Community. It maintains that its actions against Kalian are in accord with the UPCA because Kalian does not stand in the shoes of a declarant. (Def. Brief in Support of Mot. to Dismiss, Dkt. Entry 25, at 27.) As explained *infra*, the Association's position with respect to Kalian's status lacks substantial merit. Thus, the motion to dismiss will also be denied as to Counts III through VII.

The defendants seek dismissal of Counts VIII through X of the complaint because the allegations underlying these claims lack sufficient specificity. Count VIII seeks recovery for the defendants' alleged interference with plaintiff's contractual relations. The elements of a cause of action for interference with contractual relations, whether existing or prospective, include: (1) the existence of a contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct. *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 412 A.2d 466, 471 (1979); *Strickland v. Univ. of Scranton*, 700 A.2d 979, 985 (1997). In the complaint, Kalian alleges that it has entered into or is in the process of entering into sales agreements on certain unimproved building lots with third party purchasers, and that the Association's insistence that Kalian pay Association fees and assessments constitutes intentional interference with these contractual relationships. Kalian has satisfied the pleading requirements for intentional interference with contractual relations. The Association's arguments—that Kalian fails to delineate when the Association imposed liens on any building lot sold to a third party buyer, and that there is no documentation substantiating the allegation—are more appropriate for a summary judgment motion.

Similarly, in Count IX, Kalian claims that the defendants have intentionally interfered with prospective contractual relations. To make out a viable claim for this tort, a plaintiff must show that there is a "reasonable probability that a contract will arise from the parties' current dealings." *Alvord–Polk, Inc. v. F. Schumach-er & Co.*, 37 F.3d 996, 1015 (3d Cir.1994). Kalian alleges that it is in the process of marketing the unimproved building lots to prospective third party purchasers, and that the defendants are intentionally interfering with these prospective contractual relationships by insisting that Kalian pay Association fees and assessments. (Complaint, ¶¶ 106–08.) Again, the determination of whether Kalian has sufficient evidence to show that it has a prospective contract and that the defendants intentionally interfered with it can only be made after discovery.

Finally, the defendants seek dismissal of Count X of Kalian's complaint, which alleges slander of title/commercial disparagement. Kalian alleges that the defendants "are disparaging Kalian's title to these unimproved building lots to prospective third party purchasers by claiming that Kalian must pay various Association fees, assessments and other charges on these lots and by placing and/or threatening to place liens upon any lots sold for the non-payment of these fees, assessments, and other charges." (Complaint, ¶ 116.) The Pennsylvania Superior Court, describing the tort of slander of title, has stated:

> "Slander of title is the false and malicious statement, oral or written, made in disparagement of a person's title to real property.... The element of malice, express or implied, in making slanderous statements respecting the title of another's property, is essential to the recovery of damages, and in the absence of proof of such malice the action will fail. While the statement may be false, or made without right, there can be no legal malice and no action will lie, if it is made in good faith and with probable cause. If the statement is made by a stranger, the law presumes malice; but if the party making the statement is

himself interested in the matter and announces the defect of title in good faith, either to protect his own interest or to prevent the commission of a fraud, there is no presumption of malice."

*Reed Road Assocs. v. Campbell,* 400 Pa.Super. 119, 582 A.2d 1373, 1374 n. 2 (1990)(quoting 5 *Thompson on Real Property* § 2395 at 194–95). Thus, Kalian must show that the defendants made a false statement regarding Kalian's building lots, that this statement was communicated to a third party, and that the defamatory meaning of the statement was understood by the third party.

Kalian, however, does not appear to allege a communication. It states generally that the defendants are "disparaging" its title by "claiming" that Kalian owes Association fees and assessments. But, Kalian does not allege that these claims were communicated to third parties. A plaintiff claiming slander of title must allege a publication to a third party. *See, e.g., Jaindl v. Mohr,* 432 Pa.Super. 220, 637 A.2d 1353, 1358 (1994)("A complaint for defamation must, on its face, identify exactly to whom the allegedly defamatory statements were made."). Kalian has failed to state a claim for slander of title/commercial disparagement upon which relief can be granted. Therefore, the defendants' motion to dismiss will be granted as to Count X.[15]

## THE MOTION FOR JUDGMENT ON THE PLEADINGS

### A. The Applicable Legal Standard

Kalian labels its motion a "motion for partial judgment on the pleadings." Under Federal Rule of Civil Procedure 12(c), however, a motion for judgment on the pleadings may be made only after the pleadings are closed. The pleadings in this matter are not closed because the defendants have not yet filed an answer to the complaint. Rather, they filed motions to dismiss under Rule 12(b). *See* 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1367, at 513 (2d ed.1990)(stating that a "plaintiff cannot move under Rule 12(c) until after an answer has been filed"). Thus, were Kalian's motion treated as a motion for judgment on the pleadings, it would undoubtedly be premature.

The motion, however, is better construed as one for partial summary judgment. Indeed, both parties appear to have done so. Kalian submitted with its motion several exhibits that were neither attached nor referred to by the complaint.[16] (*See* Exs. to Pl. Mot. for Judgment on the Pleadings, Dkt. Entry 29.) The defendants explicitly state that the motion "is, in effect, a Motion for Summary Judgment filed pursuant to the Court Order of February 28, 2003." (Def. Brief in Opp., Dkt. Entry 40, at 8.) Generally, when a motion for judgment on the pleadings is converted into a summary judgment motion, the court must give the parties notice and an opportunity to be heard on the summary judgment question. *See Schering Corp. v. Food & Drug Admin.,* 51 F.3d 390, 400 (3d Cir.1995); *Rose v. Bartle,* 871 F.2d 331 (3d Cir.1989). However, "when both parties submit 'materials beyond the pleadings in

---

15. Count X will be dismissed without prejudice, and Kalian will be granted leave to amend its complaint if it can allege, in good faith, the requisite communication to third parties of information that purportedly defamed its title to the property in question.

16. Were Kalian's motion not premature, it would still be necessary to convert it into a motion for summary judgment. Rule 12(c) states that where "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment." Prior to such a conversion, a court must provide the parties with a reasonable opportunity to submit materials appropriate for a summary judgment proceeding. As explained above, this requirement is satisfied in this case.

support of or opposing a motion to dismiss, the prior action on the part of the parties puts them on notice that the judge may treat the motion as a Rule 56 motion.'" *Caldwell v. W. Atlas Int'l,* 871 F.Supp. 1392, 1394–95 (D.Kan.1994)(quoting *Wheeler v. Hurdman,* 825 F.2d 257, 260 (10th Cir.), *cert. denied,* 484 U.S. 986, 108 S.Ct. 503, 98 L.Ed.2d 501 (1987)). Our own Court of Appeals has noted that "[n]o point would be served by remanding [for failure of district court to give parties notice] simply to permit the parties ... to renew and relabel the various motions ...." *Sprague v. Fitzpatrick,* 546 F.2d 560, 563–64 (3d Cir.1976). *Cf. Switlik v. Hardwicke Co.,* 651 F.2d 852 (3d Cir.1981). Here, both parties have filed exhibits in addition to the pleadings, and have had an opportunity to argue the relevance of those exhibits during oral argument.[17] Therefore, Kalian's motion will be treated as a summary judgment motion.

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In this case, the facts necessary to resolve the declaratory judgment claims are essentially undisputed. The parties are in agreement as to the identity and authenticity of the pertinent documents, which have been presented to the Court. The dispositive question is whether the agreements are ambiguous, in which event summary judgment at this stage of the case would be inappropriate.

**17.** Indeed, it is clear to the Court that the parties have submitted all the evidence relevant to the questions presented by the declaratory judgment claims.

**18.** Neither party has raised a choice-of-law issue. Therefore, the court will assume that both parties agree that Pennsylvania contract

## B. Rizzo/Silver Ridge Assigned Their Declarant Rights to Kalian

Kalian moves for summary judgment on Counts I through VII (the declaratory judgment claims). Basically, Kalian argues that it acquired declarant and developer rights through the series of agreements beginning with the Settlement Agreement between Lehman–Pike and the Association, and that the Association may not impose certain fees and assessments on Kalian because of those declarant and developer rights. Thus, the critical issue presented by Kalian's motion is one of contract interpretation—did Kalian receive declarant and developer rights from Rizzo/Silver Ridge under the Assignment of April 5, 2002?

It is useful to first review the principles of contract interpretation in Pennsylvania.[18] The Pennsylvania Supreme Court, summarizing these principles, stated recently:

The fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties. The intent of the parties to a written agreement is to be regarded as being embodied in the writing itself. The whole instrument must be taken together in arriving at contractual intent. Courts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed. "When a writing is clear and unequivocal, its meaning must be determined by its contents alone." Only

law would apply to the interpretation of this contractual provision, and accordingly, apply Pennsylvania law to the facts of this matter. *See Clark v. Modern Group Ltd.,* 9 F.3d 321, 326 (3d Cir.1993)(federal court sitting in diversity must apply the substantive law of the forum).

where a contract's language is ambiguous may extrinsic or parol evidence be considered to determine the intent of the parties. A contract contains an ambiguity "if it is reasonably susceptible to different constructions and capable of being understood in more than one sense." The question, however, is not resolved in a vacuum. Instead, "contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts." In the absence of an ambiguity, the plain meaning of the agreement will be enforced. The meaning of an unambiguous written instrument presents a question of law for resolution by the court.

*Murphy v. Duquesne Univ. of the Holy Ghost,* 565 Pa. 571, 777 A.2d 418, 429–30 (2001) (citations omitted).

There can be no doubt that Rizzo/Silver Ridge assigned to Kalian "all of the declarant rights, obligations and interest assigned to [them] by Lehman–Pike," including specifically the "rights, obligations and interests ... set forth in Paragraph 12 of the Settlement Agreement ...." (Ex. 4, Assignment of Declarant and Developer Rights and Interest to Kalian, Dkt. Entry 29, ¶ 1.) Paragraphs 12(a) and 12(b) of the Settlement Agreement are repeated verbatim in the Assignment to Kalian, and they are repeated verbatim in the Assignment from Lehman–Pike to Rizzo/Silver Ridge.

There is no dispute that Kalian received the declarant rights that were listed in paragraph 12(a) of the Settlement Agreement. That paragraph specified that Lehman–Pike, "its successors and assigns, shall retain the rights stated in Exhibit 2 for the Development ... for the exclusive purposes directly related to the sale of its existing unsold Lot inventory ...." Exhibit 2 is the Assignment of Declarant Rights executed by Lehman–Pike and the Association. Significantly, it provides that "Leh-

man–Pike, its successors and assigns, shall ... retain the status as a Declarant for the sale of its remaining lot inventory ...." (Ex. 2, Dkt. Entry 29, ¶ 1, at 2–3.) Section 5103 of the UPCA defines a declarant as, *inter alia,* a person who succeeds under section 5304 (relating to transfer of special declarant rights) to any special declarant rights. Lehman–Pike retained its declarant status as to the unimproved building lots, and this status was assigned to Rizzo/Silver Ridge and then to Kalian.

The Association argues that paragraph 12(a) allowed Lehman–Pike to retain only certain declarant rights specified by the attached Assignment, and thus does not insulate Kalian from fees and assessments levied by the Association. The Assignment, however, states that "Lehman–Pike, its successors and assigns, *shall also retain* the status as a Declarant for the sale of its remaining lot inventory, *and* as to the rights retained by it under this Assignment." (Ex. 2, Dkt. Entry 29, ¶ 1, at 2–3, emphasis added.)

Regardless of the impact of paragraph 12(a), it is paragraph 12(b) that drives the outcome of this matter because that provision specifically exempted Lehman–Pike from paying dues or assessments on unimproved lots held for sale to the public. The parties, though, vigorously dispute the assignability of the paragraph 12(b) exemption. The Association insists that Lehman–Pike's rights under paragraph 12(b) of the Settlement Agreement, which exempted Lehman–Pike from paying any dues or assessments on unimproved lots held for sale to the public, were not assignable because the phrase, "its successors and assigns," which was included in paragraph 12(a), is omitted after Lehman–Pike in paragraph 12(b). (Def. Brief in Opp., Dkt. Entry 40, at 10–11.) Significantly, however, there is no explicit prohibition

against assignment of rights conferred by paragraph 12(b).

 There is a presumption of assignability of contractual rights and duties in Pennsylvania. "Absent an express provision against assignment, the rights and duties under an executory bilateral contract which does not involve personal skill, trust, or confidence may be assigned without the consent of the other party so long as it does not materially alter the other party's duties and responsibilities." *Smith v. Cumberland Group, Ltd.*, 455 Pa.Super. 276, 687 A.2d 1167, 1172 (1997). Counsel for the Association conceded at oral argument that there is no express provision prohibiting Lehman–Pike's assignment of its right to be exempt from Association fees and assessments. Nor is the agreement, read as a whole, silent on this "implication." Paragraph 19 of the Settlement Agreement, which states that the Settlement Agreement "shall bind and *inure to the benefit of the parties and their respective heirs, successors and assigns,*" (emphasis added), is contrary to any implication that paragraph 12(b) is not assignable.

The defendants argue that the omission of "its successors and assigns" in paragraph 12(b) creates an ambiguity which precludes this Court from granting summary judgment to Kalian. While poor draftsmanship arguably may exist, a contract ambiguity does not exist.

Whether an ambiguity exists is to be determined by the Court as a question of law .... A contract is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends; and a contract is not rendered ambiguous by the mere fact that the parties do not agree upon the proper construction.

*Pennsylvania Dep't of Transp. v. L.C. Anderson & Sons, Inc.*, 69 Pa.Cmwlth. 601, 452 A.2d 105, 106 (1982); *see also Williams v. Nationwide Mut. Ins. Co.*, 750 A.2d 881, 885 (Pa.Super.2000)("A contract is not rendered ambiguous merely because the parties disagree upon its construction.")(citing *Riccio v. Am. Republic Ins. Co.*, 453 Pa.Super. 364, 683 A.2d 1226, 1233 (Pa.Super.1996), *aff'd*, 550 Pa. 254, 705 A.2d 422 (1997)).

Here, the Settlement Agreement is susceptible to only one *reasonable* interpretation—that Lehman–Pike's declarant rights were freely assignable. The contract says nothing to the contrary. Indeed, paragraph 19 of the Settlement Agreement makes clear that any and all contractual rights could be assigned. And, as previously stated, Pennsylvania courts have held that it is unreasonable to imply a restriction of the assignment of contractual rights. Thus, the Settlement Agreement is not ambiguous as to assignability.[19]

The Association points to the Lehman–Pike/Association Agreement of September 21, 2000 as showing that Lehman–Pike acknowledged that it did not have the right to assign the rights it acquired pursuant to

19. The Association argues that an interpretation that Lehman–Pike was authorized to assign its exemption from the obligation to pay dues and assessments would make no sense because anyone who would purchase from Lehman–Pike, or its subsequent purchasers, would never be required to pay dues and assessments so long as the lot remained unimproved. (Def. Brief in Opp., Dkt. Entry 40, at 11.) The Court fails to see how such an interpretation would not make sense—allowing developers to be free from dues and assessments encourages development of the unimproved lots. Moreover, paragraph 12(b) applies only to unimproved lots "which are held for sale to the public." This bolsters the conclusion that this provision was meant to encourage development of the unimproved lots.

paragraph 12(b). (Def. Brief in Opp., Dkt. Entry 40, at 11.) The September 21, 2000 Agreement, in pertinent part, provided that:

> The Association hereby agrees and acknowledge that the June 1, 2000 Assignment ... between Lehman–Pike and [Rizzo/Silver Ridge] constituted a valid and effective assignment ... by Lehman–Pike to [Rizzo/Silver Ridge] of the 'Declarant Rights' of Lehman–Pike, as such term is defined in the Assignment and in settlement agreement dated September 15, 1999 ....

(Sept. 21, 2000 Agreement, ¶ 1.) Paragraph 1 of the September 21, 2000 Agreement goes on to state that "[c]onsequently, the [Rizzo/Silver Ridge] lots shall not be subject to annual dues or any special assessments adopted by [the Association] ...." It is thus clear that Lehman–Pike assigned to Rizzo/Silver Ridge the right not to be subject to dues and assessments for unimproved lots held for public sale. Indeed, it is the Association that explicitly acknowledged the validity of the assignment. There is nothing in the Lehman–Pike assignment to Rizzo/Silver Ridge that would have precluded Rizzo/Silver Ridge from then assigning those same rights to Kalian.

The Association relies upon the fact that paragraph 1 of the September 21, 2000 Agreement provides that dues and assessments may be levied on the Rizzo/Silver Ridge lots after they are transferred or leased to third parties. The Association contends that this declaration shows that Lehman–Pike did not have the right to transfer the Paragraph 12(b) interests in the first place. This argument ignores the fact that Rizzo/Silver Ridge is not a party to the September 21, 2000 Agreement. Kalian obtained the rights and interests of Rizzo/Silver Ridge, and the Association cannot limit or alter those rights and interests. Having acknowledged that Lehman–Pike could assign its rights and interest under the Settlement Agreement, including the provisions of paragraph 12(b), the Association cannot now restrain the further assignment of those rights and interests.[20]

In summary, the Settlement Agreement did not restrict the assignability of Lehman–Pike's declarant rights. Lehman–Pike assigned these rights to Rizzo/Silver Ridge, which, in turn, assigned these rights to Kalian. Therefore, summary judgment is appropriate on Count I of the complaint. Additionally, paragraph 12(b) is not ambiguous as to the assignability of the fee exemption. Rather, it is silent. When there is no express restriction on assignment of rights in a contract, and where, as here, the agreement inures to the benefit of "the parties and their ... assigns," it is unreasonable to construe the provision as restricting assignments. Thus, the paragraph 12(b) exemption was assigned to Kalian, and judgment will be granted Kalian on Counts I and II of the Complaint.

## C. The Impact of the UPCA

Count III of the complaint seeks a declaratory judgment regarding the effects of foreclosure upon association liens. Specifically, Kalian has acquired mortgages on certain unimproved building lots located within the community. Kalian states that it plans to foreclose upon these mortgages

---

**20.** If Lehman–Pike did not have the right to assign its interests under paragraph 12(b), as the Association contends, the more appropriate course of action would have been to have Lehman–Pike secure the Association's written consent to the Assignment. Paragraph 1 of the September 21, 2000 Agreement is not such a written consent, but an unambiguous acknowledgment by the Association that Lehman–Pike's assignment to Rizzo/Silver Ridge was "valid and effective."

in accordance with Pennsylvania law. Section 5315(b)(2) of the UPCA states that:

The association's lien for common expenses shall be divested by a judicial sale of the unit:

(i) As to unpaid common expense assessments made under section 5314(b) (relating to assessments for common expenses) that come due during the six months immediately preceding institution of an action to enforce collection of a lien against a unit by a judicial sale, only to the extent that the six months' unpaid assessments are paid out of the proceeds of the sale.

(ii) As to unpaid common expense assessments made under section 5314(b) other than the six months' assessment referred to in subparagraph (i), in a full amount of the unpaid assessments, whether or not the proceeds of the judicial sale are adequate to pay these assessments. To the extent that the proceeds of the sale are sufficient to pay some or all of these additional assessments after satisfaction in full of the costs of the judicial sale and the liens and encumbrances of the types described in paragraph (1) and the unpaid common expense assessments that come due during the six-month period described in subparagraph (i), the assessments shall be paid before any remaining proceeds may be paid to any other claimant, including the prior owner of the unit.

68 Pa. Cons.Stat. Ann. § 5315(b). Kalian seeks a declaration that § 5315 "controls the determination of the amount of a lien for outstanding common expenses the Association may collect from Kalian upon foreclosure." (Complaint, Dkt. Entry 1, at 12.)

The Association "acknowledges that, by virtue of the assignment alone, Kalian has no financial obligations with respect to dues, assessments or other charges." (Def. Brief in Opp., Dkt. Entry 40, at 16.) The Association also points out that, should Kalian foreclose on the mortgages, it would only be obligated to pay the Association those fees which would be due under § 5315. As there is no dispute that § 5315 of the UPCA controls the determination of the amount of a lien for outstanding common expenses the Association may collect from Kalian upon foreclosure, there is no controversy between the parties that warrants a declaratory judgment. Thus, Count III of the Complaint will be dismissed as moot.

■■■ In Count IV of the complaint, Kalian seeks a declaration that Kalian is not obligated to pay for any resale certificates for unimproved building lots previously acquired by Kalian, acquired through foreclosure of defaulted mortgages, for lots hereinafter acquired, or for lots sold by Kalian in the future.[21] Under § 5302(a)(12) of the UPCA, the Association may impose reasonable charges for the preparation of resale certificates required by. § 5407. Section 5407(b) requires an Association to furnish a resale certificate upon request. All owners who resell their property are required to obtain a resale certificate, *except* declarants. 68 Pa. Cons. Stat. Ann. § 5407(a). Kalian has succeeded Lehman–Pike as a declarant. The Association is only required to provide resale certificates upon the request of property

---

**21.** Any decree in this case will be limited to the building lots presently owned by Kalian and mortgages presently held by Kallan. There is no controversy concerning building lots Kalian may acquire in the future and any issue concerning such lots is not yet ripe. *See Peachlum v. City of York,* 333 F.3d 429, 433 (3d Cir.2003)("The existence of a case and controversy is a prerequisite to all federal actions, including those for declaratory or injunctive relief.")(quoting *Presbytery of New Jersey of Orthodox Presbyterian Church v. Florio,* 40 F.3d 1454, 1462 (3d Cir.1994)).

owners and, as a declarant, Kalian need not obtain a resale certificate before selling its building lots. Therefore, judgment will be granted to Kalian on Count IV.

In Count V, Kalian seeks a judgment declaring that it is not obligated to pay any capital improvement fee imposed by the Association for the unimproved lots it has acquired or will acquire. It is undisputed that a declarant cannot be charged a capital improvement fee. Because Kalian is a declarant, it is entitled to judgment on Count V.

■■■ In Count VI, Kalian seeks judgment declaring that it is not obligated to pay the Association's Application and Appraisal fee, nor supply a compliance bond to the Association. Kalian argues that the UPCA allows community associations to levy only certain fees on lot owners within the planned community. Specifically, 68 Pa. Cons.Stat. Ann. § 5302(a) expressly provides for an annual assessment for the maintenance of common elements, fees for resale certificates, capital improvement fees, fines and penalties for late payments of the aforementioned fees, and fines for violations of the declaration, bylaws, or rules of the association. Section 5302(a)(12) further provides that "an association may impose a capital improvement fee, but no other fees, on the resale or transfer of units . . . ." Kalian argues that the compliance bond and the application and appraisal fee are not provided for by the UPCA and, therefore, the Association lacks the authority to impose these assessments on Kalian.

In response, the Association contends that, "although the UPCA does not specifically provide for [these fees], nor does it specifically prohibit them." (Def. Brief in Opp., Dkt. Entry 40, at 14.) The Association insists that both the compliance bond

and the application and appraisal fees are "triggered by construction, not transfer of property," (*id.*), and therefore do not fall under the § 5302(a)(12) prohibition on fees on the resale or transfer of units other than a capital improvement fee.

Given the Association's justification for the bond and fee, it is not § 5302 that directs the outcome of this claim, but § 5105(c), which limits the fees an association may impose against lot owners for constructing, altering, renovating or repairing a unit in a planned community. Section 5105(c) states that an association may not impose "any fee for .the right to construct, alter, renovate or repair a building or improvement except for an inclusive fee for the actual direct costs to the association" of plan reviews or inspections and building code review. The statute also states that "[e]xcept as specifically provided in this section, an association shall not impose any fees related to construction, alteration, renovation or repair of a unit." 68 Pa. Cons.Stat. Ann. § 5105(c)(2).

Thus, the Association's explanation that the compliance bond is related to construction does not save it. Section 5105 does not provide for a compliance bond (or any type of bond), and other charges relating to construction are prohibited.[22] To the extent that the Association seeks to justify the compliance bond on the impact that construction may have on community infrastructure, such as roads, § 5105(c)(1)(iii) imposes a barrier. It provides that an association may not impose "any impact fee for road maintenance or road construction" on any person constructing a unit in a planned community. The UPCA, therefore, does not permit the Association to require Kalian to post a compliance bond.

**22.** *Cf.* 68 Pa. Cons.Stat. Ann. § 5218 (stating that an association does not have the power to require a surety bond for the use of a declarant's easement rights through common property).

The application and appraisal fee has not been shown to fall into the two exceptions in § 5105(c)(ii) allowing such a fee. The Association is permitted to impose a fee for:

(A) architectural, aesthetic or landscaping plan reviews or inspections of units, building siting and exteriors, if those reviews or inspections are required by provisions of the declaration or association bylaws or rules and regulations and if such provisions requiring a fee to be paid for such reviews or inspections were in existence on or before December 31, 1995; or

(B) if association imposed building construction standards or building codes are permitted under section 5106 (relating to applicability of local ordinances, regulations and building codes), building construction standards or building code review.

The Association has not shown that it satisfies either exception. Consequently, Kalian is entitled to judgment on Count VI of the Complaint.

In Count VII, Kalian seeks a declaration that it and all other lot owners within the community are not obligated to comply with the Association Board of Director's raised minimum habitable floor space restriction of 1,600 square feet. The Association's Covenants and Restrictions contain two covenants which provide that all dwellings must contain a minimum habitable living space of 1,000 square feet. The Association concedes that the resolution was ineffective because a covenant cannot be amended by a resolution of the Association. (Def. Brief in Opp., Dkt. Entry 40, at 6–7.) Therefore, judgment will be granted to Kalian on Count VII.[23]

## CONCLUSION

The defendants' motion to dismiss will be granted as to the § 1983 claim, the civil racketeering claim, and the claim for slander of title/commercial disparagement. Kalian can not show that the Association acted under color of state law or that it committed any predicate acts that would lead to a finding of racketeering activity. Thus, these claims will be dismissed with prejudice. While Kalian has not alleged that the Association published its allegedly defamatory remarks regarding Kalian's title in the unimproved building lots to any third party, it cannot be said at this time that Kalian is unable to make such an averment. Thus, this claim will be dismissed without prejudice to the filing of an amended pleading correcting the deficiencies of the original complaint. The motion to dismiss will be denied as to all other claims.

Kalian's partial summary judgment motion will be granted because Rizzo/Silver Ridge assigned its declarant and developer rights, including the exemption from Association dues and fees, to Kalian. The Settlement Agreement between Lehman–Pike and the Association did not restrict the assignability of these rights, nor was Paragraph 12(b) of the Settlement Agreement (the exemption from fees and assessments) ambiguous as to assignability. Judgment will be granted Kalian on Counts I, II, and V on this basis. Kalian is also entitled to judgment on Counts IV, VI, and VII under the UPCA. There is no controversy concerning the applicability of 68 Pa. Cons. Stat. Ann. § 5315 upon foreclosure of mortgages held by Kalian, and Count III of the Complaint will be dismissed as moot. An appropriate Order follows.

---

**23.** Any decree in this case will be limited to the parties to this case. No judgment will be entered with respect to lot owners in general.

**600**

### ORDER

NOW, THIS 5th DAY OF AUGUST, 2003, in accordance with the foregoing memorandum, **IT IS HEREBY ORDERED THAT:**

1. Defendants' Motion to Dismiss, (Dkt. Entry 19), is **GRANTED IN PART and DENIED IN PART:**

 (a) The Motion to Dismiss is **GRANTED WITHOUT PREJUDICE** as to Count X (slander of title/commercial disparagement).

 (b) The Motion to Dismiss is **GRANTED WITH PREJUDICE** as to Count XI (civil rights claim) and Count XII (civil RICO claim).

 (c) The Motion to Dismiss is **DENIED** as to all other claims.

2. Defendant Sanderman's Motion to Dismiss, (Dkt. Entry 30), is **DENIED.**

3. Plaintiff's Motion for Judgment on the Pleadings, (Dkt. Entry 29), construed as a motion for summary judgment under Fed.R.Civ.P. 56, is **GRANTED IN PART and DENIED IN PART.**

 (a) The Motion for Judgment on the Pleadings is **GRANTED** as to Count I. It is declared and decreed that Plaintiff has acquired all of the declarant and developer rights originally retained by Lehman–Pike under the Settlement Agreement dated September 15, 1999 with respect to the unimproved building lots it acquired under the Assignment of April 15, 2002.

 (b) The motion is **GRANTED** as to Count II. It is declared and decreed that Plaintiff, as declarant, is not obligated to pay any Association fees, assessments, or other charges on any of the unimproved building lots it has acquired under the Assignment of April 15, 2002.

 (c) The motion is **DENIED** as to Count III. Count III shall be **DISMISSED AS MOOT.**

 (d) The motion is **GRANTED** as to Count IV. It is declared and decreed that Plaintiff is not obligated to pay for any resale certificates for unimproved building lots acquired by Plaintiff under the Assignment of April 15, 2002.

 (e) The motion is **GRANTED** as to Count V. It is declared and decreed that Plaintiff is not obligated to pay for any capital improvement fees for the unimproved building lots it has acquired under the Assignment of April 15, 2002.

 (f) The motion is **GRANTED** as to Count VI. It is declared and decreed that Plaintiff is not obligated to pay the Association's Application and Appraisal fee nor supply a Compliance Bond to the Association.

 (g) The motion is **GRANTED** as to Count VII. It is declared and decreed that Plaintiff is not obligated to comply with the Defendants' raised minimum habitable floor space restriction of 1,600 square fee and that this restriction is null and void.

4. A telephonic scheduling conference shall be conducted on **Thursday, August 28, 2003 at 3:00 p.m.** Counsel for the Plaintiff is responsible for placing the call to (570) 207–5720 and all parties shall be ready to proceed before the undersigned is contacted.